[Nos. 24829-4-I; 26274-2-I; Division One. January 27, 1992.]
28689-7-I.

*In the Matter of the Marriage of* DIANE IRWIN, *Appellant, and* GERALD IRWIN, *Respondent.*

40

*Robert J. Frederick* and *Lane Powell Spears Lubersky; A. Kyle Johnson* and *Stanislaw, Ashbaugh, Chism, Jacobson & Riper,* for appellant.

*Walter G. Meyer, Mark David Watson,* and *Meyer, Fluegge & Tenney,* for respondent.

SCHOLFIELD, J. — Diane Irwin appeals the trial court's decree of dissolution of her marriage to Gerald ("Jere") Irwin. Jere cross-appeals. We affirm in part and reverse in part.

## FACTS

The Irwins were married in 1958. The couple has five children, only one of whom was a minor (b.d. 9/27/72) at the time of trial. The couple separated in January 1985. A petition for dissolution was filed on July 15, 1987. Trial took place in May 1989.

The trial court divided the couple's property, both separate and community. The court stated that it was attempting to approximate a 50-50 division, based on the lengthy duration of the marriage. To Diane, the trial court awarded the following:

| Asset | Value |
|---|---|
| a. 2300 River Road condo, subject to mortgages | $0 |
| b. 24th Ave. main plant | 562,000 |
| c. Silver bars | 1/2 |
| d. 1987 Subaru | 7,000 |
| e. Seattle houseboat, subject to indebtedness | 27,000 |
| f. Retirement | 5,000 |
| g. Seattle house, subject to loans | 77,500 |
| h. Paxton Family Trust | 250,000 |
| i. 16th Ave.—Aikens purchase option | 795,075 |
| j. 16th Ave.—23 acres | 900,000 |
| TOTAL ASSETS AWARDED TO DIANE | $2,623,575 |

The trial court awarded the following assets to Jere:

| Asset | Value |
|---|---|
| a. Yakima house, subject to indebtedness | $18,000 |
| b. Front Street building | 150,000 |
| c. 24th Ave. (2 acres), subject to indebtedness | 68,500 |
| d. Farm equip. & supplies, subject to indebtedness | 0 |
| e. Silver bars | 1/2 |
| f. Jeep | 5,000 |
| g. Corvette | 20,000 |
| h. Ranchero | 7,500 |
| i. Retirement | 226,000 |
| j. Fechter Rd. house | 48,000 |
| k. 16th Ave.—Aikens purchase option | 795,075 |
| l. Guns | 3,000 |
| TOTAL ASSETS AWARDED TO JERE EXCLUSIVE OF BUSINESSES | $1,341,075 |

The trial court determined that the couple's $70,000 IRS tax liability should be paid by Jere. Subtracting that liability from his award leaves an award of $1,271,075. At this point in the distribution, Diane had received $1,352,500

more than Jere. The trial court valued the three family businesses, IRAD (Irwin Research & Development Co.), a company that manufactures thermoforming machines that make styrofoam and hard plastic products, ITC (Irwin Technical College), a research and development company associated with IRAD, and Magic Metals, a sheet metal fabricating company that manufactures parts mainly for IRAD. Diane's expert, Arthur Brueggeman, testified that his estimate of the value of the Irwins' interest in the three companies was $7,952,000.

The trial court utilized the expert's formulas in coming up with a figure for valuing the companies.[1] The trial court took the figure $7,590,000 and reduced it by 10 percent because of the cyclical nature of businesses and because a large part of the value of the businesses was Jere himself, and arrived at a valuation figure of $6,731,000.[2]

The trial court then awarded all three businesses to Jere. To keep the property division at approximately 50-50, the trial court determined that Jere would owe Diane $3,360,000 for her share of the businesses.[3] However, since she had already received a larger share of the property exclusive of the businesses, the trial court subtracted the excess from the amount due to Diane. In other words, the trial court subtracted $1,352,500 (the value of the excess assets received by Diane) from $3,360,000. The oral decision stated that the amount was approximately $2 million.[4]

The decree ordered Jere to make cash payments to Diane of $500,000 on December 31, 1989; three payments of $250,000 each on December 31, 1990, December 31, 1991, and December 31, 1992, and a final payment of $795,000 on

---

[1] It is not entirely clear from examining the oral opinion exactly what calculations were made.

[2] In fact, 90 percent of $7,590,000 is $6,831,000.

[3] Half of $6,731,000 is actually $3,365,500.

[4] The correct difference is $2,007,500 ($3,360,000 minus $1,352,500), but the trial court's figure of $2,045,500 will be used in this opinion.

December 31, 1993. In addition, four quarterly interest payments were required each year, these being $38,637.50 each in 1990; $32,387.50 each in 1991; $26,138.50 each in 1992, and $19,887.50 each in 1993. These payments are referred to by the parties as equalization payments, the purpose of the payments being to equalize the property distributions.

The trial court determined that a ground lease on the 16th Avenue property between the Irwins and IRAD was not valid. The decree states as follows:

> 9.3 There has also been testimony introduced concerning the existence of a lease of certain of the property to Irwin Research and Development Company and of lease payments to Gerald Irwin from Irwin Research totalling $240,000 that were made for such property prior to trial. The court finds that there is no such lease in existence that was signed or if it is in existence that it is invalid, of no effect, and should be cancelled and held for naught. As a result of said invalidity and cancellation, Irwin Research and Development Company is owed the amount of $240,000 as the result of lease payments made to Gerald Irwin under an unsigned lease through March 31, 1989.[5]

The trial court also awarded Diane maintenance in the amount of $12,000 per month until the equalization payments were to begin on December 31, 1989. This resulted in her receiving $84,000 in maintenance payments. The decree also ordered that the parties share in the payment of Brueggeman's fee and that Jere should pay Diane $2,500 for costs.

In a subsequent proceeding, the trial court ordered Jere to pay Diane $75,000 toward her attorney's fees. The order indicated that the court had considered:

> the efforts of attorneys for petitioner to settle the case, the fact that discovery by the petitioner was made more difficult because of the record keeping practices of the respondent and his unfamiliarity of the legal process and the respondent's ability to pay attorney fees and the fact that the respondent in all likelihood faces substantially lesser attorney fees than the petitioner . . ..

---

[5]The payment back to IRAD was to come from the proceeds of the sale of a portion of this property to Robert Aikens & Associates.

Diane held an interest in a family trust known and referred to by the parties as the Paxton Family Trust. At the time of trial, she had received an offer of $250,000 for her interest in the trust. Jere offered evidence at the trial to show the value of her interest in the trust to be much greater than $250,000. The trial judge appears to have rejected this evidence on the theory it would be immaterial if he awarded one-half of any value in excess of $250,000 to each party. After the decree was entered, it was modified at Diane's request to the extent that her entire interest in the Paxton Family Trust was awarded to her, free and clear of any claim by Jere. However, the value of her interest in the trust was left at $250,000.

Diane timely filed an appeal in this court. She also brought a motion in this court to clarify her rights under RAP 2.5(b), regarding acceptance of benefits, since she had received the maintenance payments, the attorney's fees payments, and had placed the first $500,000 equalization payment in her attorney's trust account. The commissioner's order dated January 1990 indicated that her motion should be directed to the trial court, and a 3-judge panel affirmed the commissioner's order. On May 11, 1990, the trial court ordered a $500,000 lien against her interest in the 16th Avenue property in favor of Jere as security while she pursued her appeal. Jere appealed that trial court order, and his appeal was consolidated with Diane's appeal.

Jere failed to make the $250,000 principal payment due on December 31, 1990. Instead, on January 11, 1991, he filed a motion for relief from judgment. The motion requested relief as follows:

> COMES NOW the respondent herein and hereby moves this court for an order for relief from that certain judgment and decree dated August 21, 1989, and as modified by that certain Order Modifying Findings of Fact and Conclusion[s] of Law and Decree of Dissolution dated November 7, 1989.
> Specifically, respondent seeks the following relief:
> 1. For a six-month extension of time on all principal and interest payments due on and from December 31, 1990 as provided in paragraph 7 of the Decree of Dissolution.

This motion is based upon CR 60(b)(11), the files and records herein and the sworn statements of Jere Irwin, Steven Alegria, Dave Irwin and Brett Friestadt.

The parties submitted sworn statements, affidavits, memorandums and depositions. At the hearing on the motion, Diane's counsel argued that the purpose of a CR 60 show cause hearing is only to determine whether to go forward with a full fact-finding hearing. The trial court disagreed, and declined to take any live testimony.

The trial court granted Jere's motion for relief. The order contained the following language:

### FINDINGS

1. That this court has jurisdiction to consider respondent's Motion For Relief From Judgment;

2. That Mr. Irwin's ability to make the principal payments previously ordered by this court comes through and is related to the financial condition of respondent's companies;

3. That due to emergency financial circumstances developing since the time of trial, the financial condition of the Irwin companies was such that respondent did not have the ability to timely pay the interest and principal payments otherwise due on December 31, 1990; that due to these circumstances respondent continues to have the inability to make the December 31, 1990 principal payment of $250,000;

4. That were the court not to order a six-month extension of time in which to make the $250,000 principal payment there is a substantial risk that all other payments due under the terms of the decree would be placed in jeopardy;

### ORDER

1. Based on the foregoing the court hereby orders that the $250,000 principal payment originally due on December 31, 1990 shall be deferred and that respondent shall have until July 1, 1991 to make said payment to petitioner. Further, that interest shall accrue on said $250,000 at the rate of twelve percent per annum from and after December 31, 1990 until paid;

2. That all other terms of the decree, including other principal and quarterly interest payments, are not affected by this order.

In its oral decision, the trial court stated that it did not feel that any more hearings were necessary, that RAP 7.2 permitted the court to rule on the motion because the issue

was fundamental to the court's decree, and that CR 60 set forth the framework to consider this type of motion. The trial court indicated further:

> It does fundamentally come down to my assessment of the situation and reviewing the information supplied to me by Mr. Irwin and his company and the review done by Mrs. Irwin and her experts, whether or not there is a legal basis for this. And I believe there is. I think that this company is clearly in trouble, that's the way I read these documents. I think that there is no present ability to pay on the part of Mr. Irwin. I feel badly the parties were not able to work this out between themselves. . . .
>
> . . . .
>
> . . . I am concerned that if — not only do I find that there is no present ability to pay, but I would be concerned if I were not to grant this deferrment [*sic*], that I might be jeopardizing the future decree. . . .
>
> But there should be a caveat here. It should clearly carry interest from the time that it was due. As stated on the record, whatever the legal rate is, I would assume it would be something proximating 12 percent . . ..

Diane appealed the order, and this court consolidated that appeal with the appeal pending before it regarding the decree. On June 28, 1991, Jere sent Diane a check in the amount of $278,328.90, representing the deferred principal payment of $250,000 and $28,328.90 in interest.

## PROPERTY DISTRIBUTION

RCW 26.09.080 provides for the disposition of a couple's property in a dissolution proceeding as follows:

> In a proceeding for dissolution of the marriage, . . . the court shall, without regard to marital misconduct, make such disposition of the property and the liabilities of the parties, either community or separate, as shall appear just and equitable after considering all relevant factors including, but not limited to:
>
> (1) The nature and extent of the community property;
>
> (2) The nature and extent of the separate property;
>
> (3) The duration of the marriage; and
>
> (4) The economic circumstances of each spouse at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to a spouse with whom the children reside the majority of the time.

■■ In a dissolution action, all property, both community and separate, is before the trial court for distribution. *Friedlander v. Friedlander*, 80 Wn.2d 293, 494 P.2d 208 (1972). The trial court has the duty to characterize the property of the parties as either community or separate, *Blood v. Blood*, 69 Wn.2d 680, 419 P.2d 1006 (1966), and the court must dispose of all the property of the parties which is brought before it. *In re Marriage of Soriano*, 31 Wn. App. 432, 643 P.2d 450 (1982). The status of property as community or separate is not controlling. Rather, the trial court must ensure that the final division of property is "fair, just and equitable under all the circumstances.' " *In re Marriage of Hadley*, 88 Wn.2d 649, 656, 565 P.2d 790 (1977) (quoting *Baker v. Baker*, 80 Wn.2d 736, 745-46, 498 P.2d 315 (1972)). The trial court's property division in a dissolution action is reviewed only for a manifest abuse of discretion. *In re Marriage of Konzen*, 103 Wn.2d 470, 693 P.2d 97 (1985).

Diane contends that she is entitled to all of her separate property and at least half of the community property. This contention does not find support in the case law. As noted above, the standard is a "just and equitable" distribution. An examination of the trial court's analysis, contained in the oral decision, shows that the court was trying for an approximate 50-50 division of all assets, whether separate or community, based on the fact that this was a marriage of lengthy duration.

Diane contends that in setting the value of her 23 acres' share of the 16th Avenue property ($900,000), the trial court neglected to consider the amount owed on the real estate contract in the amount of $95,367, but it later acknowledged that her portion of the property was subject to that debt. However, in the oral decision the trial court stated that it was determining that the property was worth $44,000 per acre. Doing the arithmetic, the 23 acres would be worth approximately $1 million. Subtracting the amount due on the real estate contract leaves an amount *greater* than the $900,000 value given. This asset was not overvalued.

Diane also contends that relieving the remaining 16th Avenue property of the debt increased the value of Jere's assets. However, any proceeds from the other acres were to be divided in half. There was no error.

Diane next argues that the court overvalued several of her assets by failing to adjust for encumbrances on her houseboat, Subaru, Yakima condominium, and Seattle residence. This is incorrect. There is no mention of encumbrances on the Subaru, but the trial court reduced the value of all the other items based on money owed on them.

■ Finally, Diane contends that the trial court failed to correctly characterize some of her property as separate property and that separate property is only to be awarded to the other party in exceptional circumstances. The trial court did not award any of Diane's separate property to Jere. However, it was within the trial court's discretion to determine that the fairest distribution was an approximately equal division of all property, whether separate or community.

However, the trial court made a mathematical error in making its calculations to achieve an equal division. The trial court should only have subtracted *one-half* of the excess property awarded to Diane to make the split 50-50. As it is, Diane received a total of $4,669,075, which consists of the $2,623,575 in assets, plus $2,045,500 in equalization payments.

On the other hand, Jere received $5,956,575, consisting of the $1,341,075 he received in assets, plus the businesses valued at $6,731,000, minus the $70,000 income tax liability, minus the $2,045,500 in equalization payments ($1,341,075 plus $6,731,000 minus $70,000 minus $2,045,500 = $5,956,575).

This leaves a differential between the parties of $1,287,500. The oral decision indicates that this was not the trial court's intention. What was intended was an approximately equal division. Jere contends that the income tax liability on the $2,045,500 must be taken into account. In his brief he indicates that:

> These payments are on an after-tax basis to petitioner since the money has to be taken out of the Irwin businesses by respondent and are necessarily taxable to him and/or the businesses as salary or dividends. I.R.C. §1041.

Brief of Respondent, at 24.

We are not persuaded by this argument. While it is true that Jere is subject to federal income tax on personal withdrawals from the corporations, it is also true that the corporations can claim deductions for all amounts distributed to Jere. The corporations can all be classified as closely held by the Irwin family. We are not persuaded that the impact of federal taxation under these circumstances makes the overall distribution inequitable.

After consolidating this appeal with Diane's appeal of the trial court's order modifying the decree (allowing Jere to delay for 6 months the equalization payment of $250,000 due on December 31, 1990), a supplementary hearing was held. In the documents filed with this court preparatory to that hearing, Diane acknowledged in a sworn affidavit that in November 1990, a settlement had been approved in the Paxton Trust litigation, entitling her to receive $1,500,000 as her share of the trust. She also acknowledged that $214,286 of that amount was received on December 31, 1990, and that the remaining $1,285,714 was scheduled to be paid in equal annual payments of $214,284 each over the next 6 years with interest on the declining balances.

This evidence is undisputed and constitutes an admission of material fact relevant to the issue of whether the property division in this case is fair, just and equitable. The evidence is properly before us and can be used in our decision, even though it appears to be a posttrial development that was not before the trial court. The discrepancy of $1,287,500 caused by mathematical error and described earlier in this opinion would normally require that Jere pay to Diane an additional $643,750. However, we now know that Diane's interest in the Paxton Trust has a value of $1,500,000. This is substantially in excess of the discrepancy of $1,287,500 and makes any further adjustments

unnecessary in order to achieve the trial court's goal of an approximately equal property division. The property division is affirmed.

## ALEGRIA'S TESTIMONY

Steven Alegria is an accountant who has done work for the family businesses for a number of years. Diane argues that he was an inappropriate witness to testify on Jere's behalf because he had a professional relationship with both Diane and Jere, thus violating the accounting profession's rules concerning conflicts of interest. Jere argues that there was no error in admitting Alegria's testimony because Diane also called Alegria in her case, Diane's expert based his opinion in large part on facts and figures supplied by Alegria, and Alegria gave no opinion on his valuation of the Irwin businesses.

Our examination of the trial transcript regarding Alegria's testimony shows that Diane did call him initially as her witness. In addition, Diane's valuation expert, Brueggeman, utilized Alegria's figures in doing his computations. Alegria's testimony, when he was called by Jere's counsel, primarily dealt with the numbers generated through the accounting done for the businesses.

Diane objected at trial because Alegria prepared certain exhibits entered into evidence at trial. However, Alegria testified that the information from the exhibits came strictly from his accounting work, not from information subsequently supplied by Jere. There was also a concern because Alegria made some computations about recent cash flow in the businesses.

In any event, Diane contends that the taint of allowing Alegria to testify was that the trial court used Alegria's figures in determining the valuation of the businesses. However, so did Diane's expert, Brueggeman. The trial court's calculations utilized one of Brueggeman's formulas, reducing the valuation by 10 percent, on the basis of Alegria's calculations.

In its oral decision, the trial court noted that it was not confident regarding Brueggeman's valuations for the businesses because they were based on the 3 best years. However, the trial court felt that just using Alegria's figures would be too pessimistic, so Brueggeman's valuations were reduced by 10 percent. There was no abuse of discretion, nor did any error result from Alegria's testimony.

Diane's brief emphasizes a "conflict of interest" in allowing Alegria to, in essence, testify against her. RCW 18.04-.405(1) states as follows:

> (1) A certified public accountant . . . shall not disclose any confidential information obtained in the course of a professional transaction except with the consent of the client or former client or as disclosure may be required by law, legal process, the standards of the profession . . ..

It is clear from the record that Alegria had permission from his client, IRAD, to disclose pertinent financial information. He did not testify to Diane's personal finances. In addition, it also seems obvious that legal process, *i.e.*, the court's need to fairly and equitably divide the Irwins' property, required Alegria's disclosures. There was no violation of a client confidence nor any conflict of interest. The trial court did not err in admitting Alegria's testimony.

## THE 50-YEAR GROUND LEASE

Diane argues that the trial court had no authority to invalidate the ground lease between the Irwins and IRAD for a portion of the 16th Avenue property. She contends that by doing so, the trial court turned a community asset into a community debt. Jere contends that any error is harmless because the trial court did not take the invalidation of the lease into account when valuing the Irwin companies. In addition, Jere contends that Diane's expert assumed the lease was illusory when he calculated the value of IRAD based on capitalization of earnings.

■ We find there was no error resulting from the trial court's decision to ignore the ground lease as an asset to be awarded. RCW 59.04.010 provides:

> Tenancies from year to year are hereby abolished except when the same are created by express written contract. Leases

may be in writing or print, or partly in writing and partly in print . . ..

An oral lease for a term exceeding a year, where the lessee has taken possession with the lessor's consent, is enforceable only as a tenancy from month to month. *See Backus v. Feeks,* 71 Wash. 508, 129 P. 86 (1913). Given that a signed lease was not introduced at trial,[6] the trial court did not err in determining that the 50-year ground lease did not exist as an asset to be divided by the parties.

In addition, as Jere points out in his brief, a reinstatement of the ground lease would be a net "wash" because the value of IRAD would be decreased by the amount of the lease, and Jere's assets would be increased by the presence of a long-term account receivable.

### DISPOSITION OF THE 16TH AVENUE PROPERTY

Diane contends that the trial court failed to provide finality by leaving her and Jere as tenants in common until after the option to buy a certain portion of the property had been accepted or refused. Diane further argues that the trial court erred in forcing them to arbitrate any differences. Jere contends that the trial court's disposition provided for a reasonable distribution of the property, and was not invalid just because it was not immediate. Jere also contends that the arbitration provision was justifiable.

As noted above, RCW 26.09.080 requires that the trial court make a disposition of the parties' property and liabilities that is fair, just, and equitable. Case law has interpreted this language to mean that the trial court must dispose of all property brought to its attention, and gives the parties the right to have their property interests "definitely and finally determined in the decree which divorces them." *Shaffer v. Shaffer,* 43 Wn.2d 629, 631, 262 P.2d 763 (1953).

---

[6]Diane attempted to introduce a signed copy of the lease in her motion for reconsideration. Apparently, the trial court rejected the proffer as being untimely because there was no showing that it was newly discovered evidence that could not have been found in time for trial.

In *Byrne v. Ackerlund*, 108 Wn.2d 445, 739 P.2d 1138 (1987), the Washington State Supreme Court held that a judgment awarding one spouse a share of the proceeds of a sale of property awarded to the other spouse, along with a lien to secure that interest, constituted a final disposition of the property. This was so even though no time limit prior to which the sale must be conducted was contained in the decree. *Byrne*, at 451-52.

Here, the provisions for the disposition of the property are much more definite than those upheld in *Byrne*. The Irwins needed only to remain as tenants in common until it was determined whether the Aikens option on the property would be accepted. There is nothing indefinite about the provision.

In its distribution, the trial court was trying to avoid putting Jere in the position of having to liquidate or borrow against his businesses. If the court had awarded the whole property to Jere, the resulting inequity would have required Jere to either immediately sell the 16th Avenue property to pay Diane her fair share or to raise a large amount of cash from his businesses. If Diane were awarded the property, there would have been difficulty because IRAD had facilities on the land. In addition, part of the land was orchard land, and she no longer lived in Yakima to be able to deal with the property's cultivation.

■ However, the requirement for arbitration is not valid. The decree requires that any arbitration would be governed by the American Arbitration Association rules. This means that there is no opportunity for trial court de novo review of an arbitration decision, as there is here in Washington under mandatory arbitration in superior court. Traditionally, arbitration has been a consensual method for dispute resolution. We are aware of no authority for the proposition that a court has the power to order parties to solve disputes by arbitration. Accordingly, the arbitration provision is stricken from the decree.

## SPOUSAL MAINTENANCE AND CHILD SUPPORT

Diane argues that she is entitled to spousal maintenance because she gave up personal opportunities in favor of caring for her husband and children. Diane further contends that the trial court erred in awarding only $600 per month in child support.[7] Jere argues that there was no finding of necessity for Diane to receive maintenance and that the extensive property she received and cash payments she will receive precluded the need for maintenance. Jere argues further that Diane did not raise the child support issue in the trial court.

██ "Alimony" (spousal maintenance) is not awarded as a matter of right. Whether alimony should be awarded must be based on two factors — the needs of the receiving spouse and the ability of the paying spouse to pay. *See Friedlander v. Friedlander*, 80 Wn.2d 293, 494 P.2d 208 (1972). The trial court here did not err in failing to award permanent maintenance. The purpose of spousal maintenance is to support a spouse, typically the wife, until she is able to earn her own living or otherwise become self-supporting. Given the extent of the property awarded to Diane, some of which is income producing, there was no need to award spousal maintenance while she trained for a career.

Nevertheless, the trial court recognized that Diane could not be left for any length of time with no cash, and ordered that $12,000 per month in maintenance should be paid until the equalization payments fell due. It should be noted that Jere attempts to characterize those $12,000 payments as property payments, but an examination of the oral decision shows that the trial court characterized them as maintenance. There was no trial court error regarding the maintenance award.

██ However, with respect to the issue of child support, Diane is correct that it was error for the trial court to fail to

---

[7]The child involved was born September 27, 1972, and became an adult on September 27, 1990.

fill out the required child support worksheets. The Washington State Supreme Court, in *In re Marriage of Sacco*, 114 Wn.2d 1, 784 P.2d 1266 (1990), held that it is mandatory for the trial court to do so. Therefore, a remand on this issue is in order to enable the trial court to consider the child support award in light of the worksheet data.

### PAXTON TRUST

Jere argues that the trial court should not have awarded the entire interest in the Paxton Trust without allowing him the opportunity to present witnesses concerning the value of the interest.

The trial court's ruling was correct at the time it was made. When the trial court ruled on this matter, it appeared to be influenced by Jere's offer to have the court divide equally any trust value in excess of $250,000. Equal division of any value of Diane's interest in the trust exceeding $250,000 did make the offered evidence immaterial. The error occurred when the trial court modified the decree by awarding the entire interest in the trust to Diane, but left the value at an estimated $250,000.

However, the error was harmless because, as previously stated herein, we have reliable information as to the true value of her interest in the trust and are able to use it in deciding the issues surrounding the property division in this case. We have no reason to believe the offered evidence would have shown a greater value than has now been established in a court-approved settlement.

### CHARACTERIZATION OF 16TH AVENUE PROPERTY AND MAGIC METALS

Jere argues that these assets were purchased after the couple separated, making them separate property. Diane argues that there was substantial evidence that the assets were community assets. The record indicates that the 16th Avenue property was acquired in the names of both parties, and Magic Metals was an outgrowth of IRAD, a community asset. This issue is without merit.

ACCEPTANCE OF BENEFITS

Jere argues that by accepting payments from him and disposing of property awarded her in the decree, Diane has waived her right to appeal the property distribution. Diane responds that the trial court has set security in this case and that there was no waiver of her right to appeal.

RAP 2.5(b) states as follows:

**(b) Acceptance of Benefits.**

(1) *Generally.* A party may accept the benefits of a trial court decision without losing the right to obtain review of that decision only (i) if the decision is one which is subject to modification by the court making the decision or (ii) if the party gives security as provided in subsection (b)(2) or (iii) if, regardless of the result of the review, the party will be entitled to at least the benefits of the trial court decision.

(2) *Security.* If a party gives adequate security to make restitution if the decision is reversed or modified, a party may accept the benefits of the decision without losing the right to obtain review of that decision. The trial court making the decision shall fix the amount and type of security to be given by the party accepting the benefits.

In *In re Marriage of Hadley*, 88 Wn.2d 649, 565 P.2d 790 (1977), the trial court was required to divide the couple's assets, worth over $9 million. The trial court awarded Mrs. Hadley $545,000 in community property, and $480,000 in maintenance, payable over a 10-year period. During the marriage, she was diagnosed as having multiple sclerosis, and at the time of the trial was completely disabled. *Hadley*, at 651-52.

On appeal, the *Hadley* court addressed whether Mrs. Hadley had waived her right to appeal by acceptance of the benefits of the dissolution decree. Mr. Hadley had delivered certain properties and maintenance payments to Mrs. Hadley, pursuant to the decree. *Hadley*, at 653.

Noting that Mr. Hadley did not contend that Mrs. Hadley was entitled to any less than she received from the decree, the *Hadley* court stated that a successful appeal could only increase her share of the property. Therefore, Mr. Hadley could not be prejudiced by Mrs. Hadley's acceptance of her award under the decree. In addition, the *Hadley* court

observed that Mrs. Hadley's financial needs were great due to her disability, and she might be precluded from appealing if she could not accept her award under the decree. *Hadley*, at 653.

Here, Diane apparently accepted seven $12,000 payments, sold the Seattle houseboat, deposited the initial $500,000 equalization payment in her attorney's trust account, and negotiated three checks totaling $77,500, representing attorney's fees and costs awarded by the trial court.

We hold that Diane would at least be entitled to the benefits already received. Jere conceded in his brief that if this court were to affirm all the proceedings below, he would waive his right to argue the issues in his cross appeal. The monetary issues raised here by Jere concern the possible additional recovery with respect to the Paxton Trust and the award of attorney's fees.

Even if this court had reversed the order modifying the decree that made the Paxton Trust Diane's separate property, this would not affect the payments accepted by Diane. In addition, given Jere's concession regarding the cross appeal, this court would only reach the attorney's fee issue if additional property were awarded to Diane. Any additional property award would offset any reduction in attorney's fees, leaving Diane in the same position or better than before the appeal. Thus, RAP 2.5(b)(1) is satisfied.

In addition, Diane has not waived her right to appeal because she has complied with the requirements of RAP 2.5(b)(2). At the time she accepted the $500,000 payment, Diane brought a motion in this court to clarify her rights and obligations under RAP 2.5(b). The commissioner's order of January 22, 1990, indicated that this court could not decide whether Diane was permitted to accept the benefits of the decree below because she had already done so. With respect to whether this prejudiced Diane's right to appeal, the commissioner's order indicated that this issue must be taken up by the trial court.

Diane moved to modify the commissioner's decision, and the panel affirmed the commissioner without adopting the

commissioner's reasoning, stating that Diane should seek relief in the trial court. On May 11, 1990, the trial court entered an order fixing security under RAP 2.5(b)(2), and imposed a $500,000 lien in Jere's favor against Diane's interest in the 16th Avenue property. Jere appealed that order, and his appeal was consolidated with Diane's appeal.

██ The thrust of Jere's argument seems to be that the trial court's security order came too late because Diane had already waived her right to appeal. There is nothing contained in RAP 2.5(b) to indicate that the security order must occur prior to accepting the benefits. The purpose of RAP 2.5(b) was complied with as a result of the trial court's order.

### DEFERRED PAYMENT

Diane argues that the trial court erred in allowing Jere to defer the principle payment due on December 31, 1990. Jere contends this issue is moot. A case becomes moot if it is deprived of its practical significance or becomes purely academic. The term "moot" has variously been applied to include cases concerning an abstract question not resting on existing facts, cases in which the rights have expired due to lapse of time, cases in which no judgment rendered could be put into effect, and cases seeking an advisory decision. 5 Am. Jur. 2d *Appeal and Error* § 762 (1962).

Ordinarily, if a case only concerns moot questions, an appeal should be dismissed. *Zehring v. Bellevue*, 103 Wn.2d 588, 694 P.2d 638 (1985). However, an exception will be made when a moot issue is determined to be of "substantial or continuing public interest." *Zehring*, at 590. The test criteria are whether:

(1) the issue presented is of a public or private nature, (2) it is desirable to provide guidance to public officers, and (3) the issue is likely to recur.

*Zehring*, at 590. In *Hart v. Department of Social & Health Servs.*, 111 Wn.2d 445, 759 P.2d 1206 (1988), the Washington State Supreme Court stated that there was likely a fourth test, that is, the level of genuine adverseness and the quality of the advocacy of the issues. *Hart*, at 448.

■ The United States Supreme Court has adopted another exception to mootness: Though moot, a case may be reviewed if the error complained of is " 'capable of repetition, yet evading review.' " *Roe v. Wade*, 410 U.S. 113, 125, 35 L. Ed. 2d 147, 93 S. Ct. 705 (quoting *Southern Pac. Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498, 515, 55 L. Ed. 310, 31 S. Ct. 279 (1911)), *reh'g denied*, 410 U.S. 959, 35 L. Ed. 2d 694, 93 S. Ct. 1409 (1973). Diane contends that this issue is capable of recurrence because Jere will attempt to delay subsequent payments that are due, then pay them back before any appeal can be heard. We agree and hold that the issue is not moot.

Diane argues that the trial court erred in refusing her proffered live testimony. The federal cases cited by Diane in support of her argument are not on point. The one case cited that specifically mentioned live testimony, *FDIC v. Alker*, 234 F.2d 113 (3d Cir. 1956), dealt with a motion for a new trial, and the *Alker* court indicated that an offer of proof as to the testimony of the new witnesses was needed, along with the opportunity for cross examination, to enable the trial court to decide whether to grant a new trial. *Alker*, at 117. This statement has no application to the circumstances before us.

The Washington case cited by Diane is *In re Marriage of Maddix*, 41 Wn. App. 248, 703 P.2d 1062 (1985). In that case, a woman sought to have her divorce decree vacated. She claimed that her former husband had concealed the true value of his interest in his business. The interest had been awarded to him in the decree. *Maddix*, at 249.

The wife's motion was made pursuant to CR 60(b)(4), alleging fraud, misrepresentation, or other misconduct. Three affidavits were submitted to the court, one by each of the parties, and one by the husband's business partner. The trial court granted the wife's motion, but did not make reference to fraud. The findings merely stated that the husband had failed to disclose the value of the business. The order vacated the decree as to the value of the business and set trial to establish the value. *Maddix*, at 252.

According to the *Maddix* court, the facts alleged by the wife were disputed by the husband, and no further testimony was taken by the court to resolve the controverted issues. The *Maddix* court then stated that:

> The affidavits raise an issue of fact which cannot be resolved without the taking of testimony. . . . The court erred in vacating the judgment without first hearing and weighing testimony regarding fraud, misrepresentation or other misconduct.

(Citations omitted.) *Maddix*, at 252.

█ However, none of the authorities cited by the *Maddix* court state any requirement for live testimony in determining a CR 60 motion. In *Baer v. Lebeck*, 126 Wash. 576, 219 P. 22 (1923), the court stated that the trial court did not "try or consider" any issue of fact. *Baer*, at 579. In *Whidby Land & Dev. Co. v. Nye*, 5 Wash. 301, 31 P. 752 (1892), the issue was whether the appellate court should strike affidavits submitted in the lower court as not part of the record before it. Finally, in *Wood v. Copeland Lumber Co.*, 41 Wn.2d 119, 247 P.2d 801 (1952), the motion in question was supported by an unsworn, unsigned statement, and the court found that not to be competent evidence. The *Maddix* court also noted that CR 60(e)(2) provides for a show cause hearing. However, nothing in CR 60(e)(2) appears to indicate that live testimony is required.

In fact, the only relevant reference to oral testimony in the court rules is contained in King County Superior Court Local Rule 94.04(b), dealing with family law proceedings. In pertinent part that rule states that:

> (1) *Family Law Motions.* Except as otherwise provided in this rule all motions and returns on order to show cause shall be heard on the 9:30 a.m. daily Family Law Motion Calendar on the basis of affidavit or declaration.
>
> A request for oral testimony shall be clearly stated in the note and motion for hearing, with the basis therefor, *and, if granted,* shall be set for a prearranged hearing time on the Family Law Motion Calendar.

(Italics ours.) Thus, oral testimony is not the general rule and is discretionary. Therefore, we are unsure of the basis

for the *Maddix* court's statement that oral testimony was required there, unless a Spokane County local rule so requires, or the particular facts of that case made it necessary. Diane has not shown support for her argument that the trial court erred in refusing her proffered testimony.

In any event, if there was error, it was harmless. The trial judge below was the same judge who heard the entire dissolution case. He was well versed in the parties' financial circumstances. He did not need oral testimony to help him judge credibility. In addition, any oral testimony would most likely have been cumulative. Diane does not argue that some vital fact was not presented to the trial court. We hold that the trial court did not err in refusing to permit Diane to present oral testimony.

Diane further argues that CR 60(b)(11) does not provide authority for the trial court's action here. RCW 26.09.170(1) states as follows:

> (1) Except as otherwise provided in subsection (7) of RCW 26.09.070,[8] the provisions of any decree respecting maintenance or support may be modified only as to installments accruing subsequent to the motion for modification . . . The provisions as to property disposition may not be revoked or modified, unless the court finds the existence of conditions that justify the reopening of a judgment under the laws of this state.

CR 60(b) states in pertinent part:

> On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:
>
> . . . .
> (11) Any other reason justifying relief from the operation of the judgment.

In *In re Marriage of Yearout*, 41 Wn. App. 897, 707 P.2d 1367 (1985), a husband sought to modify a decree provision for spousal maintenance, arguing that his decreased earnings made the provision unfair. In rejecting his argument, the *Yearout* court stated that the use of CR 60(b)(11) should

---

[8]That subsection permits a separation contract to expressly preclude or limit modification of maintenance.

be reserved for situations "involving extraordinary circumstances not covered by any other section of the rules.' " *Yearout*, at 902 (quoting *State v. Keller*, 32 Wn. App. 135, 140, 647 P.2d 35 (1982)). Further, the *Yearout* court stated that those circumstances must relate to "irregularities extraneous to the action of the court or questions concerning the regularity of the court's proceedings." *Yearout*, at 902.

In *In re Marriage of Flannagan*, 42 Wn. App. 214, 709 P.2d 1247 (1985), *review denied*, 105 Wn.2d 1003 (1986), the issue was whether the Uniformed Services Former Spouses' Protection Act (USFSPA) could be applied retroactively pursuant to CR 60(b)(11). The USFSPA was enacted after the United States Supreme Court had decided *McCarty v. McCarty*, 453 U.S. 210, 69 L. Ed. 2d 589, 101 S. Ct. 2728 (1981), forbidding state courts from distributing military retirement pay as community property. The federal statute permitted reopening of divorce decrees to distribute the military pay as community property. *Flannagan*, at 222.

The *Flannagan* court held that the enactment of the USFSPA constituted extraordinary circumstances under CR 60(b)(11). The *Flannagan* court also noted that motions for relief from judgment under CR 60 are reviewed under the clear abuse of discretion standard and that such abuse occurs when the discretion is based on untenable grounds or reasons. *Flannagan*, at 222-23.

In *In re Marriage of Tang*, 57 Wn. App. 648, 789 P.2d 118 (1990), a wife sought to have a dissolution decree vacated and a property settlement agreement set aside on the grounds that the decree failed to list, characterize, and evaluate certain items of property, and because it left the parties as tenants in common to most of their property. The trial court granted the request, and this court reversed and reinstated the decree.

The former wife argued, *inter alia*, that the trial court's order could be upheld under CR 60(b)(11). The *Tang* court declined to do so, noting that the rule has previously been invoked in unusual situations where there has been reliance on mistaken information. *Tang*, at 656.

Diane also directs the court's attention to the following statement in Washington Practice:

> Under CR 60(b)(11), the motion may be made for "[a]ny other reason justifying relief from the operation of the judgment." This ground is narrowly limited to situations involving *extraordinary circumstances* that do not fall within any other provision of the Rule. Motions under CR 60(b)(11) are also circumscribed by the general doctrine: the reasons for vacation must be extraneous to the court's actions or must affect the regularity of the proceedings. In essence, a change in the law justifies granting the motion, whereas a change in the circumstances of the party does not.

(Footnotes omitted.) 1 B. Barker & I. Scharf, Wash. Prac. § 10.5, at 141 (3d ed. 1989).

■ Applying the law to the facts before us, we hold the trial court erred in granting relief under CR 60(b)(11). The facts here are, in some ways, similar to those in *In re Marriage of Yearout, supra,* and the statement in Washington Practice suggests that changed financial circumstances is an insufficient reason to allow a trial court to grant a CR 60(b)(11) motion.

■ Nevertheless, *Yearout* is factually distinguishable because Jere did not seek a change in the property award itself. He merely requested a delay in payment. This did not result in any pecuniary loss to Diane. On the contrary, she received a 12 percent rate of return on her money, a reasonable interest rate. Thus, any error was harmless, and we so hold.

### ATTORNEY'S FEES

The trial court ordered Jere to pay $75,000 toward Diane's attorney's fees based on the fact that Diane and her counsel attempted diligently to settle the case prior to trial, but Jere was unwilling to do so, and because Jere had a greater ability to pay. RCW 26.09.140 states that:

> The court . . . after considering the financial resources of both parties may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for reasonable attorney's fees or other professional fees in connection therewith . . ..

> Upon any appeal, the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorney's fees in addition to statutory costs.

The purpose of the statute is to allow parties to fully litigate issues related to their dissolution without regard to the ability to afford legal bills.

Presumably, Jere has a greater ability to earn a living than Diane and, therefore, he is better able to afford the legal bills. While the trial court certainly did not find that Jere committed misconduct, it may have felt that Jere's greater ability to pay resulted in his reluctance to settle. In any event, we find no basis for concluding the trial court abused its discretion in requiring Jere to pay a portion of Diane's fees and this court will not disturb that award.

However, we decline to award any attorney's fees to either party on appeal.

This case is remanded on the issue of child support, the arbitration provision regarding the 16th Avenue property is stricken, and in all other respects the judgment is affirmed.

FORREST and KENNEDY, JJ., concur.

Reconsideration denied March 4, 1992.

Review denied at 119 Wn.2d 1009 (1992).